**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

BRENDA FELTON,

               Plaintiff,

v.                                         ACTION NO. 2:12cv558

MICHAEL J. ASTRUE,
Commission of Social Security,

               Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff brought this action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. This Court recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively applied for DIB and SSI on February 17, 2009,[1] alleging a disability as of January 14, 2009, caused by diabetes, tendonitis and bursitis in her shoulder, neuropathy,

---

[1] Plaintiff filed a previous DIB application, which was denied at the initial level of consideration on May 18, 2007. R. 249. Plaintiff did not pursue the case further.

asthma, bronchitis, and arthritis in both hands. R.[2] 144-56, 253.  The Commissioner denied

Plaintiff's application at the initial level, and at the reconsideration level of administrative

review. R. 70-107, 118-29. The plaintiff then requested a hearing by an Administrative Law

Judge (ALJ). R. 130-34.  On October 28, 2010, Plaintiff, who appeared with counsel, and a

vocational expert testified before the ALJ. R. 35-48.

On November 15, 2010, the ALJ found that Plaintiff was not disabled within the meaning

of the Social Security Act. R. 23-34.  The Appeals Council denied Plaintiff's request for

administrative review of the ALJ's decision. R. 1-6. Therefore, the ALJ's decision stands as the

final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g),

1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

## II. FACTUAL BACKGROUND

A. Plaintiff's Background

Plaintiff was born in 1955 and was 53 years old on her alleged disability onset date. R.

38. She graduated from high school, and completed some nurse training. R. 38, 167, 246, 257,

267.  She has past relevant work experience as a nursing assistant, a bread slicer, a telemarketer,

a caterer, and a telephone operator. R. 39-40, 45, 200, 201, 223, 242, 246, 254, 261, 297-310.

She last worked as a telemarketer and stopped working on January 13, 2009, when she was laid

off. R. 39, 200, 261-62.

In a Function Report completed in conjunction with her disability applications, Plaintiff

reported that she lived alone in an apartment. R. 232. She reported that she could tend to most of

her personal care needs independently and did not need reminders to take care of her grooming,

to take medicine, or to go places. R. 233, 236.  Her daughter helped with Plaintiff's hair and with

her insulin, because Plaintiff's hands were sore and would swell. R. 233.  She prepared her own

---

[2] The citations in this Report and Recommendation are to the Administrative Record.

2

meals, dusted, folded laundry, made her bed daily, went outside daily, used public transportation, shopped in stores, and spent time with others daily. R. 234-36.  Her daughter did her laundry. R. 234.   Plaintiff paid bills, counted change, handled a savings account, and used a checkbook/money orders. R. 235.  Plaintiff listed her interests and social activities as: reading, doing puzzles, watching television and movies, reading the Bible, listening to music, and attending church activities. R. 236. She reported that she went to church every Sunday and sometimes on Wednesday nights. R. 236. Plaintiff denied having problems getting along with family, friends, neighbors, or others; paying attention; or reading and understanding written and spoken instructions. R. 237. She stated that she got along "very well" with authority figures, and had never been fired or laid off from a job because of problems getting along with other people. R. 238.  She stated her vision was dim, her hands were stiff with arthritis, and she hurt all of the time. R. 237.   She also indicated she took prescribed medication for stress, and that stress affected her blood pressure and blood sugar. R. 238.

B.  Medical History[3]

Plaintiff suffers from diabetes and high blood pressure, and has had asthma since birth. R. 346, 601.  In January 2002, seven years prior to her alleged disability onset date, Plaintiff injured her right shoulder in a motor vehicle accident. R. 325-28.  Plaintiff is five feet and one inch tall, and weighed 222 pounds on August 15, 2010, one month prior to her ALJ hearing. R. 240, 252, 546, 588, 779.

On April 12, 2009, Plaintiff sought emergency room care for an asthma exacerbation. R. 469, 601.   She was treated with Prednisone, which led to vomiting and upper gastrointestinal

---

[3] Defendant does not dispute Plaintiff's recitation of the medical evidence. Def.'s Mem. in Supp. of Mot. for Summ. J. 13, ECF No. 15.  In Plaintiff's Reply, Plaintiff offered minor corrections and additions to Defendant's recitation of medical evidence. Pl.'s Reply 2-6.  Consequently, the factual background in this Report and Recommendation is largely taken from the recitations made in the three briefs filed by the parties.

bleeding due to gastritis requiring an endoscopy procedure and a nine-day hospital stay. R. 466-583, 601. During her hospitalization from April 12 through April 20, 2009, Plaintiff was treated for severe esophagitis, upper GI bleeding, severe reflux, dehydration, and high blood sugar levels. R. 468-583.  Her blood sugar levels were above the normal range of 65-99 on over 30 readings taken during the hospital stay, reaching as high as 500 on one test. R. 467- 565. *See* Pl's Mem. 4-5.  With the exception of high blood sugar levels and epigastric abdominal pain, her attending providers reported essentially normal physical findings. R. 471, 488, 492-93, 519, 525. Examinations were negative for blurred vision, eye discharge or eye pain. R. 469, 487, 492. Her providers noted on two occasions that she was anxious (R. 480, 529), and on two occasions that she had a depressed mood (R. 505, 548).   Other entries reflected that she was alert and oriented; her mood, memory, affect and judgment were normal; and, she was "negative for depression and hallucinations." R. 471, 488, 492, 493, 519, 529.

Plaintiff received general medical care from the Sentara Ambulatory Care Center (Sentara) following the April 2009 hospital stay until August 2010. R. 596-662, 669-778.  She was seen by several providers, including Martha Scott, M.D., for various conditions, including diabetes and hypertension. *Id.*  Of the eleven blood sugar tests conducted during this time, eight revealed blood sugar levels above the normal range of 65-99, with levels ranging from 125-199. R. 614, 642, 655, 659, 686, 700, 705, 716, 722, 739, 742, 746, 759, 769, 771, 776.

On May 12, 2009, Plaintiff received medication for constipation and gastroesphogeal reflux disease (GERD). R. 612. On examination, she was well developed, alert, and oriented "times three" (i.e. oriented to person, place and time). R. 613-14.  She had normal heart sounds, normal lungs, a normal abdomen, and normal skin. R. 613-14.

At the state agency's request, Plaintiff attended a consultative examination with Gustavo Vargas, M.D., on June 15, 2009. R. 587-95. Plaintiff reported that she was seeking disability based on type II diabetes, hypertension, and asthma. R. 588. She explained that her diabetic neuropathy was moderately controlled by medication, and she did not know whether she had diabetic retinopathy. R. 588. She stated that her hypertension was "fairly well controlled" with treatment, and denied damage to her vital systems. R. 588. Plaintiff further explained that she had asthma since infancy, and had been hospitalized at least twice a year due to attacks. R. 588. Plaintiff alleged limitations in walking, standing, lifting, and carrying, but reported that she could sit without limitation and had no difficulty getting along with others. R. 589. She reported that she lived alone and could perform light household chores such as vacuuming, dusting, washing dishes, and laundering clothes. R. 590. She had a history of GERD, which was controlled with medication. R. 591.  She denied a history of severe anxiety and compulsive or antisocial traits, and Dr. Vargas detected no psychoses, bipolar disorder, or schizophrenia. R. 590.

On examination, Plaintiff had 20/40 uncorrected vision, normal hearing, normal speech, a normal chest, normal lungs, normal heart sounds, a normal abdomen, and normal range of motion in her neck, arms, legs, and trunk. R. 593, 595. Plaintiff performed straight leg raising testing to 90 degrees bilaterally. R. 593. Plaintiff had 2+ reflexes in her arms and legs, normal cranial nerves, and 5/5 hand and pinch strength. R. 593.  Dr. Vargas diagnosed type II diabetes with evidence of diabetic retinopathy and neuropathy, hypertension, and asthma. R. 594.

With respect to work-related abilities, Dr. Vargas opined that Plaintiff could lift 40 pounds infrequently and lift and carry 15 to 25 pounds to about 300 feet on a repetitive basis with frequent breaks; she had no manipulative limitations; she had moderate limitations in working in altitudes, using planks and scaffolds (especially in cold temperatures), working in

warm and humid environments, and speaking for several hours; she could sit for longer than four hours and stand for 1 hour; and she had no mental limitations that would limit her ability to interact with her co-workers. R. 594.

On July 14, 2009, Plaintiff arrived at Sentara for a follow-up appointment for diabetes and hypertension, and to obtain a Commonwealth of Virginia medical disability form so she could obtain food stamps. R. 640. She reported high blood sugar and blood pressure readings, attributing the high blood pressure to stress. R. 643. On examination, she had a normal heart rate and rhythm, clear lungs, small bruises on her shins, bilateral decreased sensation in her toes, bilateral pedal edema, and a pitting edema in her left foot. R. 641. The attending nurse noted that Plaintiff's asthma was asymptomatic and her GERD was well-controlled on medication. R. 643-44. Plaintiff's blood sugar reading during the appointment was 164, but Plaintiff admitted that she had not been taking all of her diabetes medications. R. 643. Plaintiff was given medication for diabetes. R. 643.

Based on a review of the record, on July 20, 2009, state agency physician Robert Castle, M.D., opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about six hours and sit for about six hours during an eight-hour day; perform unlimited pushing and/or pulling consistent with her lifting/carrying abilities; frequently climb ramps/stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to fumes, odors, dust, and poorly ventilated areas. R. 73-75. Dr. Castle identified no manipulative, visual, or communicative restrictions. R. 74.

On September 22, 2009, Plaintiff complained to Dr. Scott of numbness in her feet and high blood sugar readings, but denied eye problems. R. 653-54. She stated that she was not

taking oral diabetes medications. R. 653. With the exception of wheezes in her lungs that cleared with coughing, Plaintiff's physical and mental status examination was normal. R. 655. Dr. Scott described Plaintiff's diabetes as poorly controlled, and her hypertension and GERD as well controlled; she adjusted Plaintiff's diabetes medication regimen. R. 657.

On November 17, 2009, Plaintiff complained of peripheral neuropathy in her feet and shortness of breath with weather changes. R. 713. The attending doctor at Sentara again noted unremarkable physical and mental status findings, including that Plaintiff appeared alert and oriented times three, her eye examination was normal, and she had normal range of motion. R. 715. No changes were made to her diabetes medication regimen. R. 717.

After conducting an independent record review, on December 18, 2009, state agency physician Michael Cole, D.O., agreed with Dr. Castle that Plaintiff could perform a range of medium work. R. 93-94. Dr. Cole's assessment was essentially identical to Dr. Castle's assessment, except that Dr. Cole opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds. R. 93.

On January 19, 2010, Plaintiff arrived at Sentara complaining of chest pain and a headache. R. 698. She stated that she felt anxious about many things, including her son being in jail, but she denied suicidal or homicidal thoughts or taking psychotropic medication. R. 698. On examination, Plaintiff was in no acute distress and she had a normal neck, no edema in her arms or legs, weak pedal pulses bilaterally, and a full range of motion in her right shoulder. R. 700. The attending doctor prescribed medication, advised weight loss and exercise, and referred Plaintiff for further diabetes care and behavioral health services. R. 702.

On February 23, 2010, Plaintiff consulted with an unknown examiner at the Eastern Virginia Medical School (EVMS) Department of Psychiatry, stating she felt overwhelmed and

depressed. R. 667- 68. Plaintiff denied a psychiatric history, lethal thoughts, or psychotic symptoms, and stated that she felt "ok, happy and good" about herself. R. 667.  Plaintiff discussed sexual abuse she suffered as a child, but denied flashbacks, avoidance, numbing or physical symptoms resulting from the abuse. R. 667. She explained difficulties with her parents, and that her son had been incarcerated. R. 667-68. The examiner assessed mood disorder, NOS (not otherwise specified), sexual aversion disorder, polysubstance abuse in full sustained remission, depressive disorder, dysthymic disorder, and personality disorder, NOS. R. 668. The examiner assigned a Global Assessment of Functioning (GAF) score of 50.[4] R. 668. Plaintiff was to return in one week for another session, and was to consider starting low dose psychiatric medication. R. 668.

One week later, at a routine follow-up appointment at Sentara on March 2, 2010, Plaintiff denied behavioral or psychological problems, and denied diabetic symptoms. R. 685. Examination of her eyes, head, ears, nose, throat, lungs, heart, and abdomen was normal. R. 685. Plaintiff also had a normal gait, normal affect, normal judgment, normal memory, normal mood, and she was awake, alert, and oriented times three. R. 685.  Plaintiff weighed 212 pounds. R. 685.  She reported high blood sugar readings, but the examiner noted that Plaintiff was not taking her blood sugar readings at the right times. R. 685. Plaintiff received medication for hypertension, diabetes, and asthma. R. 687.

On March 24, 2010, a diabetic foot examination at Sentara revealed palpable pedal pulses bilaterally, diminished protective sensation, bilateral dorsal bunion deformity, crepitus with

---

[4] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of individuals. *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*) 30-32 (4th ed., text rev., 2000). A GAF between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." *Id.*

range of motion, and no open lesions. R. 672. Plaintiff was assessed with diabetic neuropathy and hallux limitus. R. 672.

On May 18, 2010, Plaintiff returned to Sentara for medication refills. R. 769. She reported that the tingling and pain in her feet was relieved by Neurontin. R. 769. She reported feeling anxious about her upcoming disability hearing, but denied depression. R. 769. Dr. Scott noted that Plaintiff was not taking psychotropic medication. R. 769. Dr. Scott documented normal physical and mental status findings, including that Plaintiff was alert and oriented times three with a normal affect, normal judgment, normal memory, and a normal mood. R. 771-73. Dr. Scott adjusted Plaintiff's medication regimen, and referred Plaintiff to a dietician. R. 771-73. In June 2010, Plaintiff was advised to eat properly and exercise to control her diabetes and obesity. R. 759-60.

On June 23, 2010, a foot examination at Sentara revealed palpable pedal pulses bilaterally, mild non-pitting edema in both feet, dorsal bunions, and limited range of motion with crepitus in Plaintiff's right foot. R. 751. Plaintiff agreed to pursue conservative treatment options for her foot pain, and was given a steroid injection. R. 751. An x-ray of Plaintiff's right foot, taken the following day, revealed narrowing of the first metatarsophalangeal joint, subcondral cysts on both sides of the joint, and a mild hallux valgus deformity. R. 754.

On July 20, 2010, Plaintiff told Dr. Scott that she was taking her diabetes medication as directed, and her blood sugar readings were between 60 and 120. R. 736. Plaintiff reported her eye doctor told her that her eyes had improved as her sugars improved, and she did not need surgery for diabetic retinopathy. R. 736. Plaintiff denied mental health symptoms and vision changes, but complained of foot pain bilaterally. R. 736-37. On examination, Plaintiff was alert and oriented times three with a normal affect, normal judgment, normal memory, and normal

mood. R. 738. Dr. Scott noted unremarkable physical findings, including with respect to Plaintiff's eyes. R. 738. Dr. Scott noted that Plaintiff's diabetes was better controlled on insulin, and increased Plaintiff's dose of Neurontin in response to Plaintiff's foot pain.  R. 740.

At a diabetic foot examination at Sentara on August 4, 2010, Plaintiff's examining podiatrist, Dr. James Underhill, noted that her diabetes was controlled. R. 726.   An x-ray revealed complete loss of the "first MPJ joint space" of her right great toe, dorsal spurring, and a subchondral cyst. R. 765.  Plaintiff expressed interest in surgery for the hallux limitus of her right foot, but needed medical clearance from her primary care physician before the elective surgery could be scheduled. R. 726.  Plaintiff decided to try conservative treatment, including stiff-soled shoes and Tylenol 500 mg for pain. R. 726.

On August 24, 2010, a polysomnogram (sleep study) at Sentara revealed constructive sleep apnea. R. 779-81. Robert D. Verona, M.D., recommended that Plaintiff begin a supervised weight loss program, control her upper airway congestion, use a CPAP machine while sleeping, and avoid driving while sleepy. R. 779-80.

Plaintiff received treatment at EVMS Ophthamology at the Lions Eye Center on seven occasions between March 5, 2010 and August 24, 2010. R. 782-90. According to these records, Plaintiff complained of blurred vision, burning, itchy and watery eyes, and floaters. R. 782-90. Plaintiff was diagnosed with severe non-proliferative diabetic retinopathy for which strict blood sugar control was recommended. R. 782-90.

C.  ALJ Hearing - October 28, 2010

At the ALJ hearing, Plaintiff testified that her main problems were diabetes and the complications arising from her diabetes, such as neuropathy. R. 40.  She testified the neuropathy caused sharp pain that could be burning, hot and quick. R. 40.  Her feet would swell, her legs go

10

numb, and one of her toes did not bend. R. 40-41.  Sometimes, she had to pull a chair in front of the sink to do dishes, because she could not stand for too long. R. 41.  She had problems with her eyes, especially her right eye. R. 40.  At the time of her hearing, she was taking three medications for her diabetes. R. 40.

Plaintiff also testified that she suffered from high cholesterol and asthma, and she took two medications for asthma. R. 40-41.  In addition, she had shoulder pain due to an accident in 1992. R. 41.

Plaintiff testified that she lived in an upstairs apartment, and only went out when she really had to, because it was difficult for her to walk up and down the steps. R. 42.  She used public transportation, but would try driving if she had a car. R. 41-42.  A van picked her up to take her to church, and her daughter took her to the grocery store. R. 42.

Vocational expert, Edith Edwards, testified at the ALJ hearing. R. 44-47. She characterized Plaintiff's past relevant work as a bread slicer as light and unskilled, her work as a telemarketer as sedentary and semi-skilled, her work as a caterer as light and skilled, and her work as a telephone operator as sedentary and semi-skilled. R. 39, 45, 297-310.

The ALJ asked Ms. Edwards whether a hypothetical individual of Plaintiff's age, education, and work experience, who could lift up to 20 pounds occasionally and 10 pounds frequently, who could not perform reaching overhead with her right dominant hand or arm, and who could not tolerate exposure to more than a minimal amount of dust, fumes, noxious odors, chemicals, respiratory irritants or extremes of heat or cold, high humidity, or wetness, could perform any of Plaintiff's past relevant work. R. 45. The VE testified that a person with those limitations could perform Plaintiff's past relevant jobs of telemarketer, telephone operator, and caterer. R. 46.

The VE further testified that a person with those limitations could perform light unskilled jobs existing in significant numbers in the national economy, including occupations of office helper (137,500 national positions) and information clerk (236,000 national positions). R. 46. The VE explained that the identified jobs could be also performed if the person could stand for up to one hour but would have to sit for up to three hours before having to stand again, but the available numbers would be reduced by half. R. 46.

The VE testified there would not be any jobs for a person who needed to take unscheduled work breaks due to pain and discomfort to the extent that the person would be off task about 15% of the time. R. 46.  Similarly, the VE testified there would be no jobs for a person limited to the work specified in the above hypothetical who was limited to unskilled, low stress work. R. 47.  Lastly, the VE testified that her testimony was consistent with the information contained in the *Dictionary of Occupational Titles*. R. 47.

### III.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law.  *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

The ALJ made a number of findings in his decision. First, he found that Plaintiff met the insured status requirement through March 30, 2010. R. 28. Second, he concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 14, 2009. R. 28. Third, the ALJ found that Plaintiff had a number of severe impairments including: diabetes, neuropathy, degenerative joint disease in the first metatarsal phalangeal joint, asthma, and right shoulder pain due to moderate tendinopathy.[5] R. 28. The ALJ concluded, however, that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 30.

Further, after looking at the record, the ALJ concluded that Plaintiff had a residual functional capacity (RFC) to lift up to 20 pounds occasionally and 10 pounds frequently, and to stand for 1 hour before requiring the opportunity to sit for up to 3 hours before having to stand

---

[5] The ALJ found that the other alleged conditions, including retinopathy, hypertension, GERD, sleep apnea, and arthritis in the hands, did not meet the requirements to be considered severe. R. 28-29.

again. R. 30.  Plaintiff could perform work activities that did not require her to reach overhead

with the right dominant hand and arm. R. 30-31.   The ALJ found Plaintiff could perform

activities as long as they were not performed where there is more than a minimal amount of dust,

fumes, noxious odors, chemicals or respiratory irritants; and as long as they were not performed

in extremes of heat or cold, high humidity, or wetness. R. 31.

The ALJ found that Plaintiff was capable of performing her past relevant work as a

telephone operator. R. 33.  Based on these findings, the ALJ concluded that Plaintiff had not

been under a disability as defined by the Social Security Act. R. 34.

Plaintiff argues the ALJ erred in (1) finding Plaintiff did not have a severe mental

impairment, (2) finding Plaintiff's diabetic retinopathy was not a severe impairment, (3) failing

to consider that Plaintiff was severely obese, (4) assessing Plaintiff's subjective complaints, and

(5) finding that Plaintiff could perform her past relevant work as a telephone operator. Pl. Mem.

9.

A.   The ALJ's Finding that Plaintiff's Mental Impairments are Not Severe is
     Supported by Substantial Evidence

Plaintiff asserts the ALJ committed errors when evaluating Plaintiff's mental condition

by (a) not mentioning the February 23, 2010 mental evaluation by the EVMS Department of

Psychiatry where Plaintiff was diagnosed with multiple psychiatric disorders and assessed a GAF

of 50, and (b) not having a psychiatrist or psychologist complete a Psychiatric Review Technique

to assess the severity of Plaintiff's mental impairments. Pl. Mem. 12-18.

It is important to note at the beginning of this discussion that Plaintiff did not claim her

ability to work was limited due to a mental disability in the disability reports accompanying her

applications for DIB or SSI dated March and April 2009 (R. 253, 261), or in the disability reports

accompanying her appeals dated August 2009 (R. 273) and March 2010 (R. 283).  Plaintiff did

not mention any mental disability at her hearing in October 2010 when asked by the ALJ about what problems she was having and why she could not work anymore. R. 40-44. Moreover, Plaintiff's argument, that the ALJ erred in finding her mental impairments to be nonsevere, is based entirely on one document in the record reflecting a mental assessment at EVMS Psychiatry where the evaluator assigned Plaintiff a GAF score of 50. R. 667-68.

The ALJ discussed Plaintiff's medically determinable mental impairments of "Mood Disorder, Depressive Disorder, Dysthymic Disorder, and Personality Disorder," and determined that these impairments, considered singly and in combination, "do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere." R. 29. The ALJ considered the four broad functional areas set out in the regulations for analyzing mental impairments – activities of daily living; social functioning; concentration, persistence, or pace; and, episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ found Plaintiff had no limitations in her activities of daily living based on her ability to take care of her personal needs, cook, do household chores, go shopping with assistance, regularly attend church, read, watch television, and write poetry. R. 29. Next, the ALJ found Plaintiff had no limitations in social functioning, and "exhibited the capacity to interact appropriately and communicate effectively with other individuals," based on Plaintiff's report of spending time with others as well as her exhibiting comfort in social situations such as the doctor's office, hospital, and at the hearing. R. 29. The ALJ found Plaintiff had mild limitation in the third functional area - concentration, persistence, or pace - based on the medical records showing she was consistently alert and oriented to person place and time, her ability to focus and appropriately answer questions during her hearing, and her basic competency to understand money and manage funds. R. 29. Lastly, the ALJ found Plaintiff had experienced no episodes of

decompensation of extended duration. R. 29.  The ALJ applied the correct analysis dictated by the regulations, and there is substantial evidence in the record to support the finding that Plaintiff's mental impairments are nonsevere.

In April 2009, during Plaintiff's hospitalization, her providers noted she was anxious (R. 480, 529), and had a depressed mood (R. 505, 548), though indicating in other entries that her "mood, memory, affect and judgment" were normal (R. 471), and "negative for depression and halucinations" (R. 492).  During her consultative examination with Dr. Vargas, Plaintiff denied a history of severe anxiety or compulsive or antisocial traits. R. 590.  Dr. Vargas detected no psychoses, bipolar disorder, or schizophrenia, and found Plaintiff had no mental limitations that would limit her ability to interact with her co-workers. R. 590, 594.   During doctor's examinations in May and November 2009, Plaintiff was alert and oriented times three (R. 613, 715); and, in October 2009, her mental status examination was normal (R. 655).

In January 2010, Plaintiff presented to Sentara with complaints of chest pain and headache, stating she felt anxious about many things including her son being in jail. R. 698.  She denied suicidal or homicidal thoughts or taking psychotropic medication. R. 698.  She was given a referral to behavioral health services. R. 702.

On February 23, 2010, Plaintiff was evaluated at the Eastern Virginia Medical School (EVMS) Department of Psychiatry, where she stated she felt overwhelmed and depressed. R. 667-68.  The two-page record reflecting this evaluation does not contain an examiner's name. Plaintiff denied a psychiatric history, lethal thoughts, or psychotic symptoms, and stated that she felt "ok, happy and good" about herself. R. 667.  Plaintiff discussed sexual abuse she endured as a child, issues with her parents, and her son's incarceration. R. 667-68. The examiner assessed mood disorder, NOS (not otherwise specified), sexual aversion disorder, polysubstance abuse in

full sustained remission, depressive disorder, dysthymic disorder, personality disorder, NOS, and a GAF score of 50. R. 667-68. Plaintiff was to return in one week for another session, and was to consider starting low dose psychiatric medication. R. 668.  There is no indication of further mental health treatment in the record.

One week later, during an appointment at Sentara on March 2, 2010, Plaintiff denied behavioral or psychological problems. R. 685.  An examination revealed normal affect, normal judgment, normal memory, normal mood, and Plaintiff was awake, alert and oriented times three. R. 685.  Further, on March 16, 2010, less than one month after her evaluation at EVMS, a disability report was prepared in connection with Plaintiff's disability claim. R. 282-88.  The report included the following question, "[s]ince you last completed a disability report, have you seen or will you see a doctor/hospital/clinic or anyone else for emotional or mental problems that limit your ability to work?" R. 283.  Plaintiff answered "No." R. 283.

In May 2010, at a Sentara appointment to get medication refilled, Plaintiff reported feeling anxious about her upcoming disability hearing, but denied depression. R. 769.  An examination revealed normal affect, normal judgment, normal memory, normal mood, and Plaintiff was awake, alert and oriented times three. R. 771-73.  The same findings were made during a July 2010 appointment with Plaintiff's foot doctor, during which she denied mental health symptoms. R. 736-38.

The medical record summarized above supports the ALJ's finding that Plaintiff's mental impairments are nonsevere.  First, Plaintiff asserts the ALJ erred in failing to mention the EVMS evaluation or the findings in the report, including the GAF score. Pl. Mem. 13.  While the ALJ does not give the date of the evaluation or specifically state the GAF score, the ALJ found Plaintiff had the medically determinable mental impairments of mood disorder, depressive

18

disorder, dysthymic disorder, and personality disorder. R. 29.  The only mention in the record of these disorders is in the EVMS evaluation.  Therefore, the ALJ necessarily considered the evaluation, and spent several paragraphs applying the technique outlined in the regulations for analyzing the severity of the impairments.  In light of this, the fact that the ALJ did not specifically discuss the GAF score assigned during the EVMS evaluation is not cause for remand.  First, there is no direct correlation between the GAF scale and the severity requirements in the Commissioner's mental disorders listings. 65 Fed. Reg. 50746-01, 50764-65 (2000); *Gilroy v. Astrue*, 351 Fed. Appx. 714, 715 (3d Cir. 2009).  Secondly, the GAF score of 50, which indicates severe symptoms, is not consistent with Plaintiff's medical record as a whole.

Similarly, Plaintiff's assertion that due to her "long history of depression and emotional problems," the ALJ erred by failing to have a psychologist or psychiatrist complete a psychiatric review technique, is not supported by the record. *See* 20 C.F.R. §§ 404.1503(e), 416.903(e) (the agency will make every reasonable effort to have the case reviewed by a qualified psychiatrist or psychologist where there is evidence that indicates the existence of a mental impairment).  This case, in which Plaintiff never claimed an inability to work due to mental health impairments, and where the record contains few references to mental health complaints, need not be remanded for a state agency mental health review or a consultative psychological examination.  The ALJ did not err in evaluating Plaintiff's mental condition, and substantial evidence supports the ALJ's finding that Plaintiff's mental impairments are nonsevere. R. 29.

B.   The ALJ's Finding that Plaintiff's Diabetic Retinopathy and Related Vision Problems are Not Severe is Supported by Substantial Evidence

Plaintiff asserts the ALJ's finding, that her vision problems were not severe, was factually and legally flawed. Pl. Mem. 19.  Plaintiff notes she received regular and periodic eye examinations due to the seriousness of her diabetic retinopathy, the records document 20/70 to

20/200 fluctuating vision in both eyes, and Plaintiff experienced blurry vision, floaters, itchy eyes, and watery discharge. *Id.* Accordingly, Plaintiff asserts the ALJ erred in not including her vision problems in the assessment of her RFC. *Id.*

The ALJ found Plaintiff's retinopathy was not severe, because no surgery was needed, her eyes improved as her sugar improved, and it had no significant effect on work activities. R. 28-29. Substantial evidence supports this finding.

During her hospitalization in April 2009, her examination was negative for blurred vision, eye discharge or eye pain. R. 469, 487, 492. During her consultative examination with Dr. Vargas in June 2009, Plaintiff had 20/40 uncorrected vision and was diagnosed with diabetic retinopathy. R. 593-94. Dr. Vargas found no work-related limitations due to her vision. *Id.* In September 2009, Plaintiff denied having any eye problems during a diabetic checkup (R. 653-54), and eye examinations in November 2009 and March 2010 were both normal (R. 685, 715). Plaintiff correctly notes that she had an increase in appointments due to her eye condition in 2010, with seven appointments between March and August at the Lions Eye Center, where she was treated for her severe non-proliferative diabetic retinopathy. R. 782-90; Pl. Mem. 19. The treatment prescribed was for Plaintiff to strictly control her blood sugar. *Id.* At a diabetic checkup in July 2010, Plaintiff reported her eye doctor told her that her eyes had improved as her sugars improved and she did not need surgery for diabetic retinopathy. R. 736. Plaintiff denied vision changes. R. 736-67. In addition, during their independent review of the record, Drs. Castle and Cole, state agency physicians, identified no visual restrictions. R. 74, 93-94.

In reviewing the Commissioner's denial of benefits, this Court is limited to examining whether substantial evidence exists on the record to support the ALJ's findings. 42 U.S.C. § 405(g) (2011); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*,

76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not reweigh evidence, make credibility determinations, or substitute its judgment. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. With this standard in mind, based on the medical record, substantial evidence supports the ALJ's finding that Plaintiff's diabetic retinopathy was not a severe impairment.

      C.    <u>ALJ's Failure to Discuss Plaintiff's Obesity Does Not Require Remand</u>

Plaintiff correctly points out that the ALJ failed to discuss Plaintiff's obesity in the opinion. Pl. Mem. 19. Plaintiff is five feet one inch tall, and weighed between 197 and 222 pounds from her alleged onset date through the date of the administrative hearing. R. 252, 260, 268, 433, 552, 595,613, 673, 685, 700, 715, 718, 727, 736, 738, 752, 759, 761, 779. Plaintiff asserts the ALJ erred in failing to consider obesity as an underlying impairment, which would further complicate her diabetes, high blood pressure, arthritic problems, depression, sleep apnea, diabetic neuropathy, and mood disorder. Pl. Mem. 21.

While it is clear from the record that Plaintiff is obese, the ALJ's failure to specifically address her obesity in the opinion does not necessitate a remand. Plaintiff has not alleged any functional limitations caused by her obesity, which the ALJ did not accommodate in the RFC. In addition, the ALJ reviewed Plaintiff's medical history, and considered the opinions of Plaintiff's treating physicians familiar with Plaintiff's obesity. *See Klangwald v. Comm'r of Soc. Sec.*, 269 F. App'x 202, 204 (3d Cir. 2008) (holding ALJ did not err in failing to specifically discuss Plaintiff's obesity when determining whether Plaintiff met a Listing, where the ALJ provided a reasonably thorough review and discussion of Plaintiff's medical history); *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (holding ALJ did not commit error by not specifically addressing Plaintiff's obesity where Plaintiff did not explain how her obesity affected her ability to work

other than to state generally that it exacerbated her impairments, and the ALJ reviewed the medical records of physicians familiar with Plaintiff's obesity).  Lastly, Plaintiff did not allege her ability to work was limited due to her obesity in any of the multiple disability reports or during her administrative hearing. *See Davis v. Barnhart*, 197 F. App'x 521, 522 (8th Cir. 2006) (holding the ALJ did not err in failing to consider plaintiff's weight where plaintiff did not allege obesity in her application or testify about limitations resulting from her weight during her administrative hearing); *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (holding ALJ did not err in failing to address plaintiff's obesity where plaintiff did not testify that obesity caused work-related limitations, and plaintiff's treating physicians did not suggest obesity caused work-related limitations).  Under these circumstances, the undersigned does not find the ALJ made an error of law in failing to specifically address Plaintiff's obesity in the opinion.

> D.     Substantial Evidence Supports the ALJ's Credibility Determination

Plaintiff attacks the ALJ's credibility determination with regards to Plaintiff's allegations of pain, vision problems, shortness of breath, fatigue, and emotional and psychological problems. Pl. Mem. 21.  Plaintiff asserts the medical record indicates her diabetes was not well controlled with medication based on the blood sugar levels reported, and her gaining more than 70 pounds since she last worked as a telephone operator. Pl. Mem. 24.  Plaintiff further asserts the reason her treatment was conservative was because she could not afford more aggressive treatment. Pl. Mem. 24.

The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record.

*Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms; and, the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of Plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

Furthermore, as the Fourth Circuit recognizes, the Plaintiff's subjective statements about her pain are not, alone, conclusive evidence that plaintiff is disabled. 20 C.F.R. § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 591-92 (4th Cir. 1996). Finally, Social Security Ruling 96-7p states that the evaluation of a Plaintiff's subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history,

treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible." R. 31.  In reaching this determination, the ALJ first addressed how the objective medical evidence did not support Plaintiff's subjective complaints, discussing the Ambulatory Care Center (Sentara) records, the hospital admission for asthma and negative reaction to medication, the physical examination by Dr. Vargas, and the conservative nature of her treatment. R. 31-33. *See* 20 C.F.R. §§404.1529(c)(3), 416.929(c)(3) (listing treatment received and daily activities as relevant factors the ALJ will consider when evaluating symptoms such as pain). The ALJ next explained how Plaintiff's subjective complaints were contradicted by her daily activities. R. 32-33.  The ALJ noted Plaintiff prepared meals, dusted, folded laundry, used public transportation, indicated she would drive if she had a car, paid bills, handled a savings account and a checkbook, attended church every week, and did not use a cane to ambulate. R. 32.

Substantial evidence supports the ALJ's findings that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible, and the Court finds no "exceptional circumstances" exist that warrant reversing the ALJ's credibility determination. *See Edelco, Inc.*, 132 F.3d at 1011.

E.   Substantial Evidence Supports the ALJ's Finding that Plaintiff Could Perform Her Past Relevant Work as a Telephone Operator

Plaintiff challenges the ALJ's finding that she could perform work as a telephone operator, asserting primarily that the ALJ erred by failing to consider the combined effects of her impairments when reaching a determination of Plaintiff's RFC. Pl. Mem. 26-28.  After step three of the ALJ's five part analysis, but prior to deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine a claimant's residual functional capacity.  20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).   The residual functional capacity must incorporate impairments supported by objective medical evidence and impairments based on credible complaints made by the claimant.

The ALJ correctly considered the effects of Plaintiff's impairments separately and in combination, and evaluated all of the medical evidence relating to severe and non-severe impairments when assessing Plaintiff's RFC. R. 28-33.   The ALJ determined Plaintiff's RFC enables her to "lift up to 20 pounds occasionally and 10 pounds frequently.  She can stand for one hour and then requires the opportunity to sit for up to 3 hours before having to stand again. She can perform jobs where there was no requirement to reach overhead with the right dominant hand and arm.  [Plaintiff] can perform activities as long as they are not performed where there is more than a minimal amount of dust, fumes, noxious odors, chemicals or respiratory irritants, and as long as they are not performed in extremes of heat or cold, high humidity or wetness." R. 30-31.

The VE testified that the job of telephone operator was sedentary and semi-skilled; could be performed by someone who was unable to reach overhead with the right dominant hand and arm; and, did not require exposure to more than a minimal amount of dust, fumes, noxious odors, chemicals or respiratory irritants, extreme heat, extreme cold, high humidity or wetness. R. 45-46.  Based on the above RFC, Plaintiff's background and education, and the testimony of the VE, the ALJ concluded Plaintiff could perform her past relevant work as a telephone operator. R. 33-34.

Plaintiff's argument, that the ALJ did not adequately consider her mental impairments, vision impairments, and obesity when evaluating her RFC, is addressed above in Sections IV. A

through C.  Substantial evidence supports the ALJ's findings that Plaintiff's mental impairments and visual impairments were non-severe.  Nothing in the record supports Plaintiff's assertion that her mental impairments preclude her from semi-skilled work. Pl. Mem. 28.  Plaintiff's treating physicians did not identify any work-related limitations caused by Plaintiff's obesity.  Further, the medical record does not support Plaintiff's argument that she is not capable of full-time work. Pl. Mem. 29.

After reviewing the record, including the objective medical evidence and Plaintiff's daily activities, the Court concludes that there is substantial evidence to support the ALJ's finding regarding Plaintiff's RFC, and the ALJ's finding that Plaintiff can perform her past relevant work as a telephone operator.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED; the Commissioner's Cross Motion for Summary Judgment (ECF No. 14) be GRANTED; the final decision of the Commissioner be AFFIRMED; and Judgment be entered in favor of the Commissioner.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served

with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
October 3, 2013